UNITED STATES DISTRICT COURT
DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| USA, et al., | ) | 10-CV-04374-CFK |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **UNDER SEAL** |
| | ) | |
| | ) | |
| MERCK & CO., INC., | ) | Philadelphia, PA |
| | ) | January 24, 2023 |
| Defendant. | ) | 10:11 a.m. |
| | ) | |

UNDER SEAL TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE CHAD F. KENNEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Plaintiffs:        GORDON SCHNELL, ESQUIRE
                           DANIEL J. VITELLI, ESQUIRE
                           CONSTANTINE, CANNON, LLP
                           335 Madison Avenue, 9th Fl.
                           New York, NY 10017

                           KATHLEEN R. SCANLAN, ESQUIRE
                           KELLER, GROVER, LLP
                           1965 Market Street
                           San Francisco, CA 94103

                           JOHN A. MACORETTA, ESQUIRE
                           SPECTOR, ROSEMAN & KODROFF, P.C.
                           2001 Market Street
                           Suite 3420
                           Philadelphia, PA 19103

                           JOEL M. SWEET, ESQUIRE
                           U.S. ATTORNEY'S OFFICE
                           615 Chestnut Street
                           Suite 1250
                           Philadelphia, PA 19106

For the Defendants:        JESSICA ELLSWORTH, ESQUIRE
                           HOGAN. LOVELLS
                           555 Thirteenth Street
                           Columbia Square
                           Washington, DC 20004

APPEARANCES (Cont'd.):

For the Defendants:          LISA DYKSTRA, ESQUIRE
                             R. BRENDAN FEE, ESQUIRE
                             MORGAN, LEWIS & BOCKIUS, LLP
                             1701 Market Street
                             Philadelphia, PA 19103

                             DINO S. SANGIAMO, ESQUIRE
                             VENABLE, LLP
                             750 E. Pratt St., Suite 900
                             Baltimore, MD 21202


Audio Operator:              Chris Kurek

Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026-0129
                             Office:  (856) 435-7172
                             Fax:     (856) 435-7124
                             Email:    dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

I N D E X

ARGUMENT:                                    PAGE

By Ms. Ellsworth                              8

By Mr. Schnell                               23

By Mr. Sweet                                 47

By Ms. Ellsworth                             67

By Mr. Schnell                               68

Colloquy                                                    4

1          (The following was held in open court at 10:11

2     a.m.:)

3          COURTROOM DEPUTY:  All rise, please.  The United

4     States District Court is now in session, the Honorable Chad F.

5     Kenney presiding.

6          THE COURT:  Good morning, everyone.

7          ALL COUNSEL:  Good morning, Your Honor.

8          THE COURT:  All right.  This is Merck -- in re:

9     Merck and U.S., ex rel, Krahling and, what is it, Wlochowski

10    vs. Merck, and we're going to start with that one, 4374-10.

11    And then we'll follow right up with 355 of 12, and that's in

12    re: Merck, the antitrust litigation.

13          So in 43, the 10:00 argument, 4374-10, counsel for

14    the record?

15          MR. SCHNELL:  Gordon Schnell from Constantine,

16    Cannon for Relators.

17          MR. VITELLI:  Good morning, Your Honor.  Daniel

18    Vitelli, also of Constantine, Cannon, counsel for the

19    Relators.

20          MS. SCANLAN:  Good morning, Your Honor.  Kathleen

21    Scanlan, also for the Relators.

22          MS. ELLSWORTH:  Good morning, Your Honor.  Jessica

23    Ellsworth of Hogan, Lovells, for Merck.

24          MS. DYKSTRA:  Good morning, Your Honor.  Lisa

25    Dykstra, Morgan, Lewis, for Merck.

Colloquy                                                    5

1          MR. SANGIAMO:  Good morning, Your Honor.  Dino

2    Sangiamo of Venable for Merck.

3          MR. FEE:  Good morning, Your Honor.  Brendan Fee

4    from Morgan, Lewis, also for Merck.

5          THE COURT:  All right.  Everybody can have seat.

6          MR. SWEET:  Your Honor, Joel Sweet, for the United

7    States.

8          THE COURT:  Okay.  Good morning.  And there was

9    somebody here from GSK, I was told?

10         MR. COLVIN:  Good morning, Your Honor.  David

11   Colvin, on behalf of the non-party, GSK.

12         THE COURT:  And you're asking for certain parts of

13   the transcript to be restricted?

14         MR. COLVIN:  I am, Your Honor.  Would it be helpful

15   if I approach the microphone for the record?

16         THE COURT:  No, it wouldn't be.

17         MR. COLVIN:  Okay.

18         THE COURT:  We can hear you from there.

19         MR. COLVIN:  Okay.  Yes, Your Honor.  As I

20   understand it, GSK figures to play a central role in one or

21   both hearings today, based on documents and deposition

22   testimony that GSK provided in response to subpoenas served by

23   the parties in these matters.

24         THE COURT:  All right.  So, this is what we're going

25   to do, we're going to -- we will seal the transcript

Colloquy                                                               6

1    initially.  All right.  After you get the transcript, you will

2    have 30 days to redact what will be made -- redact from the

3    transcript what you claim is confidential.  So there will be a

4    sealed full version of the transcript.  And then the public

5    transcript will have your redactions in it as to confidential

6    information.  You do want to read the Third Circuit -- which

7    I'm sure you have -- the Third Circuit rulings on what is

8    confidential information.

9              MR. COLVIN:  Of course, Your Honor.

10             THE COURT:  Okay.  That's how we'll handle it.

11             MR. COLVIN:  Of course, Your Honor.  And with

12   respect to the courtroom, today, Judge, it's my understanding

13   that one or more parties may be publishing on the screen

14   documents that contain sensitive and proprietary information

15   that belongs to GSK.  It was designated under the protective

16   order, in place, entered by the Court, as confidential and

17   having confidential, and so we would object to that, unless

18   the Court were to close the courtroom for purposes of this

19   hearing.

20             THE COURT:  I'm not closing the courtroom, so I

21   don't know how you want to handle it.

22             Is there anybody in here taking confidential

23   information that they're going to use for producing something,

24   some vaccine?

25             MR. MACORETTA:  Your Honor, John Macoretta, here,

Colloquy                                    7

1    for the private plaintiffs.  We will talk about some things,

2    GSK.  We have -- their motion is that we have no basis for GSK

3    doing what they did.  To defend that, we have to show some GSK

4    documents and testimony.  We can avoid putting it on the

5    screen, but it's kind of hard to defend the motion without

6    talking about it.

7             THE COURT:  All right.  You can talk about it.  We

8    won't put it on the screen.

9             MR. COLVIN:  Thank you.

10            THE COURT:  All right.  So here we are.  We're ready

11   to go, a motion for summary judgment, right, and it's rather

12   lengthy.

13            MR. SCHNELL:  Your Honor, we had moved for summary

14   judgment, as well.  There are cross-motions.

15            THE COURT:  You have cross-motions for summary

16   judgment.  Yes, I saw that.  All right.

17            So, are you ready to begin?  You can sit at your

18   chair.  You don't have to come up here.

19            MS. ELLSWORTH:  Okay.

20            THE COURT:  Are you comfortable doing that?

21            MS. ELLSWORTH:  It's unusual to address the Judge

22   seated, but I'm happy to do so if Your Honor is --

23            THE COURT:  Well, welcome to my courtroom.  You

24   stood -- everybody stood.  We got the standing part over.  I

25   need the substance part.  So, if you're comfortable,

Ellsworth - Argument                                            8

1    sometimes, it makes it easier, and you have your co-counsel

2    there.  So that's helpful, too.  So, go ahead, you can give me

3    the preliminaries.

4              THE COURT:  Thank you.

5              Good morning, Your Honor, may it please the Court,

6    Jessica Ellsworth, for Merck, and I would like to reserve a

7    small bit of time to respond to what the Government may say

8    and also what the Relators may say in this case.

9              As I'm sure the Court is aware, everything was filed

10   under seal for the summary judgment briefs, and our view is

11   that the Court does not need to conduct this hearing under

12   seal.  It's a summary judgment hearing.  Most of the evidence

13   is quite dated, at this point, and FDA has approved GSK's

14   Mumps vaccine.  So, I think we're all on the same page about

15   that.

16             If I could, Your Honor, I'd like to hand up to you a

17   set of slides that I'll walk through with the Court.  May I

18   approach?

19        (Pause in proceedings.)

20             THE COURT:  Sure.

21             MS. ELLSWORTH:  Your Honor, the briefs cover a lot

22   of ground in this case, but we believe the summary judgment

23   can and should be granted on a number of grounds, including

24   the evidence created -- does not create a triable fact as to

25   falsity and materiality and scienter.

Ellsworth - Argument                                                9

1            But given the shortness of time, I'd like to focus,

2    today, on the argument we think is most obvious and

3    undisputable as a reason to grant summary judgment for Merck,

4    and that is materiality.

5            So if you open the slides to page two, you see a

6    graph --

7                THE COURT:  You want to start, where, with what?

8                MS. ELLSWORTH:  Materiality.

9                THE COURT:  That's where I wanted you to start, and

10   that's, really, what I want you to address, so go ahead.

11               MS. ELLSWORTH:  Thank you, Your Honor.

12           Slide two is a graphical depiction of what has

13   happened with reported cases of Mumps in this country since

14   Merck's Mumps vaccine was approved by FDA in 1967, and I think

15   that's important context to have in mind as we go through the

16   argument this morning.

17           The False Claims Act has a number of elements,

18   falsity and materiality, causation and scienter.  They are set

19   out on page three.  But materiality is what I really want to

20   focus on.  What is materiality?  Materiality is what polices

21   the line between matters of regulatory compliance or breach of

22   contract and actionable False Claims Act cases.

23           So if we turn to slide five -- excuse me -- turn to

24   slide four, you will see why this line is important.  The FCA

25   exists to protect the Government from paying fraudulent

1    claims, not to allow Relators to second guess Agency judgment

2    or ask lay jurors to do so.  And so materiality looks at what

3    the Supreme Court described as the likely or actual behavior

4    of the recipient of any alleged misrepresentation.

5         In other words, it asks whether the Agency would

6    have actually or likely done anything differently as a result

7    of a compliance issue that the Relators are alleging.  Escobar

8    emphasizes it's a demanding standard.  It's a rigorous

9    standard.  It should be strictly enforced, and that it is not

10   too fact-intensive to address at summary judgment.

11        So as the Court looks at the summary judgment

12   record, the Court should ask a straightforward question, and

13   that is whether there is any non-speculative evidence.  And

14   the non-speculative part of that is important, because to

15   avoid summary judgment, the Relators need more than

16   speculation or innuendo.

17        Is there any non-speculated evidence that CDC would

18   have made different purchasing choices in the Vaccine for

19   Children Program, based on Relators' opinions about a research

20   study known as Protocol-7 or based on Relators' opinions about

21   the meaning of a single, internal, unverified potency loss

22   model that conflicted with actual stability data?  The answer

23   is, no, there is no non-speculative evidence that CDC would

24   have made any different purchasing choices related to M-M-R II

25   or ProQuad.  Those are Merck's two combination vaccines that

1    have the Mumps vaccine as a component.

2          If we turn to slide six, I want to briefly pause to

3    make clear that there are two agencies discussed in the

4    briefing, the FDA and the CDC.  The FDA's mission is to

5    protect public health by insuring the safety and efficacy of

6    drugs, including Merck's Mumps vaccine.  FDA oversees drug

7    approval, licensing, labeling, stability testing and

8    manufacturing practices.  And it has an array of enforcement

9    authority.

10          CDC's mission is to fight and track diseases and

11   protect people from health threats.  For decades, the CDC has

12   bought Merck's Mumps vaccine, and the Vaccine for Children

13   Program, based on recommendations from its internal advisory

14   committee on immunizations practices, a group of medical and

15   public health experts that study using vaccines to control

16   diseases.

17          During the summary judgment briefing, to try to save

18   their case, the Relators repeatedly and expressly disclaimed

19   that they are pursuing a fraud on the FDA theory.  You can see

20   that in their response to our motions and in the reply on

21   their own motion.  That disclaimer makes this Court's job

22   easier.  Every time the Relators stand up -- or sitting down

23   this morning -- and point you to a piece of evidence, you

24   should ask yourself if it relates to communications or

25   obligations between Merck and the CDC.

Ellsworth - Argument                    12

1        If it, instead, relates to whether FDA should or

2    would have done something differently, it falls within the

3    theory that Relators have disclaimed, and it cannot save their

4    case.

5        If we move to slide seven, this is relevant timeline

6    for the materiality question.  22 years ago, which, to give

7    you a sense of time, is the year George W. Bush was sworn in

8    as President, FDA issued a warning letter to Merck involving

9    some lots of Mumps vaccine that predated a formulation change

10   and had dropped below the labeled potency, which was a potency

11   level Merck had always understood to be the release potency

12   and not the potency at expiration.

13       Before this warning letter issued, Merck had already

14   raised its release potency to a level that FDA had requested,

15   which is the potency used today.  Also, in 2001, one of the

16   Relators called FDA to raise concerns that Merck was

17   committing fraud in the lab he worked in, which was conducting

18   Protocol-7.

19       FDA investigated those claims for months and reached

20   an agreement with Merck on what data from Protocol-7 could be

21   used in connection with labeling changes for M-M-R II and a

22   later approval of ProQuad, Merck's new quadrivalent vaccine.

23   You fast-forward to 2010, and the Relators filed this suit,

24   alleging that Protocol-7 showed the Mumps vaccine was not as

25   efficacious as it had been back in 1967, when Dr. Hilleman

1    conducted his pathbreaking studies that led to FDA's approval.

2          The Government invested those allegations, and it

3    declined.  What followed was years of fact and expert

4    discovery, during which the Government had access to all of

5    the materials in this case, attended, participated in

6    depositions, authorized CDC witnesses to be deposed, and even

7    authorized former CDC employees to be experts for Merck.

8          Then, in 2019, the Court authorized Relators expert,

9    a former FDA Commissioner named Dr. Kessler, to go directly to

10   public health officials at FDA and CDC and offer his opinions

11   and conclusions about why the discovery record here showed

12   concerns about the Mumps vaccine that the agencies didn't know

13   about.  This submission went directly to the Director of the

14   CDC and the Commissioner of the FDA, among others.

15         It attached and discussed dozens of exhibits from

16   the discovery record and Dr. Kessler's analysis of those

17   issues.  Today, it's 2023.  I checked the CDC's website this

18   morning.  After more than two decades of hearing these

19   Relators and their experts' complaints, the CDC's very public

20   position is that the Mumps component of M-M-R II and ProQuad

21   is "very effective", with an average effectiveness of 88

22   percent when administered as recommended.

23         In other words, two decades later, the CDC has not

24   changed its views about the vaccine one whit as a result of

25   the complaint filed by these Relators.

Ellsworth - Argument                                    14

1          If we move to slide eight, I want to emphasize the

2    Court's order authorizing this submission to the CDC and FDA

3    for two reasons.  One is, it's fairly unique.  And two, it's

4    very important to the materiality question before the Court.

5    At the hearing that led to this order, which had to do with

6    whether Dr. Kessler could take certain opinions public, the

7    Court took the position that it was the expert agencies who

8    should look at Dr. Kessler's professed concerns about the

9    vaccine, based on what he saw in discovery.

10          By going to public health officials at these expert

11   agencies, the Court said that the agencies could evaluate his

12   concerns, decide whether they are valid, and decide whether

13   they warrant any action by the agencies.  On October 23rd,

14   2019, this submission went directly to public health officials

15   at CDC and FDA, including, as I mentioned, the CDC Director

16   and the FDA Commissioner.

17          We are now three years and three months later.  The

18   CDC and FDA have taken no action in response to Dr. Kessler's

19   professed opinions, concerns and conclusions.

20          If we look at slide nine, this tells us a lot about

21   why.  It is a reflection of the undisputed real world impact

22   of this vaccine.  Before the vaccine was approved, there was

23   an average of 186,000 cases of Mumps every year.  If you

24   multiply 186,000 times 23 years, the time period between 2000

25   and 2022, that would equal almost 4.3 million cases of Mumps.

1          But with the vaccine, how many cases of Mumps have

2    there been?  In actuality, there have been just over 37,000

3    cases reported.  And so the undisputed real world impact is

4    that there has been a 99.1 percent reduction in cases of Mumps

5    from the pre-vaccine era.  The timeline we were discussing and

6    this data on impact point in the same direction.

7          Despite everything that Relators and their experts

8    have said, FDA and CDC stand squarely behind this vaccine and

9    for a very good reason.  In fact, for more than 4.2 million

10   reasons, just counting the individuals who avoided Mumps in

11   the years since Relators started their campaign against this

12   vaccine.

13         If you move to slide 11 to 13, I want to make clear

14   that CDC has had full knowledge of the record in this case,

15   and yet, it's public statement of support on its website,

16   including that the vaccine is 88 percent effective, when

17   administered as recommended, has not changed, and we quote

18   those websites on those slides so you can see that for

19   yourself.

20         The FDA's public statements of support haven't

21   changed either, and you can see that on slides 14 and 15.  In

22   fact, the person who made the statement from FDA -- it's

23   listed on slide 14 -- was also a recipient of Dr. Kessler's

24   submission, Peter Marks, from FDA.

25         So after Peter Marks said that he could not state

1   strongly enough the overwhelming scientific evidence shows the

2   vaccines are among the most effective and safest inventions to

3   prevent illness and protect public health, that the vaccine

4   was very effective at protecting against Mumps, and that the

5   FDA had 50 years of experience and evidence supporting that

6   fact.  He received the Kessler submission, and he didn't take

7   that statement back.  He didn't say anything in response.

8           In reality, the CDC's purchasing patterns have not

9   changed on bit.  The FDA approved a new Mumps vaccine last

10  year, manufactured by GSK, after concluding that that vaccine

11  was non-inferior to Merck's vaccine.  No one at either agency

12  asked Merck to reprove the bonafides of its vaccine.  No one

13  sent a "dear doctor" letter to providers.  No one rescinded

14  the FDA approval.  No one asked Merck to conduct additional

15  research trials.  No one asked for a recall.  No one asked for

16  more stability testing.  No one asked for even a single batch

17  of vaccine to be traced because of some concern about potency

18  or efficacy.

19          All of this matters a great deal.  We're here more

20  than three years after Relators laid out their best case for

21  their truly bold claim that Merck lacks any data its Mumps

22  vaccine works.

23          Back at the motion to dismiss stage, the Relators

24  could get away with telling Judge Jones that he didn't know

25  what he didn't know, and they needed a chance to develop the

1    facts.  Well, here we are more than a decade older and wiser,

2    after a newly coined theory of the case during discovery, with

3    millions and millions of pages that Merck produced, dozens of

4    fact and expert witnesses deposed, including from the CDC,

5    itself, and quite literally, nothing left to be discovered

6    with regard to the complaint's allegations.

7            The Government has followed all of it.  They know

8    everything the Relators have discovered.  They have seen

9    everything the Relators have to offer, and yet, nothing has

10   changed about the agencies' opinion of the Mumps vaccine.

11   Both FDA and CDC still fully embrace this vaccine.

12           Despite all of this discovery, Relators have no

13   evidence that CDC would have stopped buying M-M-R II or

14   ProQuad based on their complaints about Protocol-7 or the

15   internal potency loss model.  On Protocol-7, the CDC witnesses

16   pointed to FDA as the agency that evaluates manufacturer

17   clinical research data as part of licensing and made clear

18   that CDC's own evaluation of effectiveness data is what is

19   most important to the agency, not clinical research trials

20   relating to licensing, which is in FDA's bailiwick of

21   responsibility.

22           On potency, certain losses of M-M-R II did actually

23   dip below the labeled potency in the late 1990s, when Merck

24   understood the label's potency to be a release potency, just

25   as it had going back to 1967.  But when that happened, FDA did

Ellsworth - Argument                    18

1    not ask Merck to recall those lots.  It issued a warning

2    letter.  That warning letter says that it would be shared with

3    contracting agencies, like the CDC, and the CDC paid for and

4    continued buying the vaccine at the statutorily capped price.

5         The Relators have no evidence, no testimony from a

6    single CDC witness that would allow them to show materiality.

7    I invite the Court to ask them to identify for you any CDC

8    witness testimony that says CDC would have stopped paying for

9    the Mumps vaccine based on a single immunogenicity study,

10   Protocol-7, or based on a single potency model that Merck had

11   already told the FDA about.  They didn't identify it in their

12   papers, and they won't be able to today.

13        We turn to slide 18.  This underscores why all of

14   this is significant.  The Relators cannot show a triable issue

15   of fact on materiality.  How on Earth can they go to a jury

16   and say CDC would have made different purchasing decisions,

17   despite all the real world effectiveness and impact data,

18   based on Protocol-7, which FDA oversaw, or an internal potency

19   loss model, which Merck told FDA about and turned out to be

20   inconsistent with real world stability data?  The answer is

21   that there is no evidence creating a dispute of fact on

22   materiality.

23        Under the Supreme Court's decision in Escobar and

24   materiality decisions from around the country, this is exactly

25   the sort of fact pattern on which summary judgment must be

Ellsworth - Argument                                19

1    granted.  And I want to just talk about the holistic analysis

2    that Escobar says this Court should conduct.

3              One of the things to look at are continued

4    purchases, which we have been discussing this morning.

5    Continued purchases can be strong evidence that the

6    materiality standard is not met, when those purchases are made

7    with knowledge.  We think there is such evidence of knowledge

8    here, based on the record in this case, the submission that

9    Dr. Kessler made directly to public health officials at the

10   CDC and the FDA, going all the way back to the warning letter

11   in 2001.  It discussed actual lots of vaccine falling below

12   the labeled potency, and Protocol-7, which the FDA interacted

13   with Merck about every aspect of.

14             The reality is, the CDC has negotiated 22 annual

15   contracts with Merck since Relator Krahling called the FDA to

16   report his concerns about Protocol-7.  CDC has negotiated 12

17   of those since the complaint was filed, five of those since

18   fact discovery ended and three of those since Relators sought

19   summary judgement, presented their best version of their story

20   to the Court, to the CDC, to FDA, and the CDC's purchases have

21   continued.

22             This kind of unwavering position renders it

23   implausible, in the words of the First Circuit in it's Nagle

24   decision.  It renders -- it substantially increases the burden

25   on Relators, in the words of the Fifth Circuit, in its Harmon

Ellsworth - Argument                    20

1   decision, and it precludes Relators from pursuing these

2   claims, in the words of the D'Agostino decision.

3          To take the D.C. Circuit's view, when the Court had

4   the benefit of hindsight, which it does in this case, it

5   should not ignore what actually occurred.  So that's the

6   continued purchases bucket.  What else is there?  Because

7   materiality is a holistic inquiry.  And I would note, on

8   continued purchases, all of those cases that I just mentioned

9   are ones that the United States' statement of interest did not

10  discuss those holdings and did not discuss the outcome in

11  those cases.

12         That moves us to the other buckets of information

13  that could show materiality or could show there is a triable

14  fact.  Here, there is no statute, no regulation and no

15  contract provision that expressly conditions the CDC's payment

16  on Mumps vaccine exceeding some specific efficacy rate or some

17  specific potency level.

18         This question about statutes, regulations and

19  contracts with such express conditions was an issue in Escobar

20  because the Circuits had split on whether courts should be

21  differentiating between conditions of payment and conditions

22  of participation.  And what the Court said in Escobar is that,

23  even where we have an expressed condition of payment, that,

24  alone, is not enough to show materiality or trying to figure

25  out what the agency would actually have done.

1         In this case, there is not the kind of statute,

2    regulation or contract provision that contains the express

3    provision that <u>Escobar</u> was talking about.  Efficacy, from what

4    the record shows, is not a procurement criteria.  It was not

5    written into the contract as a criteria, and it never came up

6    in contract negotiations.  Potency is, likewise, not a

7    condition of payment.

8         The Relators try to point to certain contract

9    provisions about CGMP regulations, which are manufacturing

10   requirements that FDA supervises, a shelf life requirement,

11   but that, really, is just about when the expiration date is,

12   and a warranty of merchantability, which just asks whether

13   there was, in fact, an FDA license, which there was, and the

14   Relators have disclaimed that they are trying to show that

15   that license was obtained fraudulently.

16        So that leaves us, in this case, in the same

17   situation that this Court identified in the <u>Dr. Reddy's</u> case,

18   where there is no statutory, regulatory or contractual

19   provision that makes statements about efficacy or potency a

20   condition of Government payment.

21        The next factor is whether this -- whether there is

22   any evidence that the CDC consistently refuses to pay claims

23   in the mine run of cases, based on non-compliance with the

24   particular statutory, regulatory or contractual requirement at

25   issue here.

1    First of all, there is not a mine run of cases about
2    these kinds of allegations.  So the Relators have pointed to a
3    bunch of other types of enforcement action that DOJ and the
4    FDA sometimes take related to misbranded and adulterated
5    drugs, related to the Anti-Kickback Statute, related to a
6    whole bunch of other types of enforcement, but there is no
7    example of a case in which CDC has refused to pay for an FDA-
8    approved drug as insufficiently protected.  They just don't
9    have one.

10    They have no example of a case in which any
11    relevant, regulatory agency was on notice of the basis of
12    Relators' allegations for more than two decades, while it
13    continued entering annual contracts to purchase the product,
14    all the while making public statements about the product's
15    effectiveness and impact and without making any comment or
16    raising any concern to the manufacturer.  Simply, there is no
17    other record evidence that could create a triable fact as to
18    materiality.

19    Two brief final legal points.  One is that courts
20    presume Executive Branch agencies and employees are
21    discharging their duties.  That's the presumption of
22    regularity.  Here, FDA and CDC's duties include analyzing the
23    validity of serious public health allegations levied by
24    Relators and their former FDA Commissioner paid expert and
25    adhering to the agencies' duties to inform the public of

1    vaccine safety concerns.  That presumption of regularity

2    should lead this Court to grant summary judgment for Merck on

3    its materiality argument.

4            The second legal point I want to make is that, as a

5    legal matter, if FDA concluded that Dr. Kessler's 2019

6    submission or anything else in this record presented "new

7    information" that should be reflected on the label, FDA was

8    statutorily obligated to take action.  That's 29 U.S.C.

9    Section 355(O)(iv)(a), and we cited that in our response to

10   the Government's statement of interest at page eight, footnote

11   five.

12           We are simply past the point where FDA's continued

13   purposeful inaction can mean nothing.  In fact, it means

14   something, and it means something as a matter of law.  The

15   indisputable record shows FDA has kept the label as it is,

16   knowing full well the specifics of the evidence in this case,

17   and CDC's purchasing patterns and related conducts have

18   remained steady, in spite of knowledge of all of the evidence

19   in this case.

20           For these reasons, we ask the Court to grant summary

21   judgment for Merck on materiality and end this case.

22           THE COURT:  Thank you, Counsel.

23           Counsel?

24           MR. SCHNELL:  Thank you, Your Honor.

25           The one thing missing from -- the one big thing

Schnell - Argument                              24

1    missing from Merck's counsel's presentation was any discussion

2    of the evidence.  So, let's talk about the evidence, give you

3    a sense of what this case is really about, and then I can talk

4    about materiality, but I think that's an important backdrop.

5            so, it starts when Merck discovered pervasive

6    potency problems with its marquis vaccine for Mumps, M-M-R II.

7    And these were problems that were so serious that it raised

8    within Merck the alarm that they better fix it or they were

9    going to be subject to a product recall.

10           The first thing they tried was to double the Mumps

11   potency to address this problem, and they did that with the

12   FDA's knowledge.  It was the FDA's suggestion, so they doubled

13   the Mumps potency.  It didn't help.  They still had Mumps

14   potency failures that they could not meet the minimum potency

15   specifications in the product label for the full 24-month

16   shelf life.  This raised the alarm within Merck to the highest

17   levels, which they did not share with the FDA, the highest

18   level so much that the documents that we have presented on

19   summary judgment -- part of the reason why we're moving for

20   summary judgment -- is that Merck internally recognized in

21   their own words that the product was misbranded, Merck's

22   words, out of compliance, Merck's words, non-marketable,

23   Merck's words.  All of those documents are in the record, but

24   Merck is not mentioning those.

25           So what do they need to do?  They needed to lower

1    the Mumps potency specification to get it back into

2    compliance.  Again, none of this was shared with the FDA, let

3    alone with the CDC.  So Protocol-7, the clinical trial at

4    issue in this case, was the clinical trial Merck needed to

5    pass to get its product back into compliance and avoid a

6    product recall.  The documents are clear, at the highest

7    levels of the company, they were concerned about a recall.  It

8    was not shared with the FDA or the CDC.

9            So, Merck started on Protocol-7 with standard

10   regular testing.  What they needed to show with Protocol-7 was

11   that the lower potency specification that they wanted to get

12   to to bring the product back into compliance, the Mumps

13   vaccine still afforded sufficient protection.  Standard

14   testing showed they weren't even close.

15           So, what do they do?  They engaged in a results-

16   oriented design of a test that would guarantee they reached

17   the result they needed.  Dr. Krall (ph) was the Chief

18   Scientist at Merck who ran this study, who designed this

19   study, who ran the lab that did the study, and we deposed him.

20   He admitted that he created a results-oriented test to get the

21   results that we needed -- that Merck needed.

22           That didn't work either, and that's when they had to

23   resort to falsifying data, destroying unfavorable data.  Our

24   Relators were there in the lab.  They saw it firsthand.  There

25   is no dispute that this did not happen, and the FDA inspection

1    that was prompted by one of our Relators was a result of that.

2    But what Merck is not saying is that even during this

3    inspection, Merck lied to the FDA to get out of it, to get out

4    of the problem.  Our Relator was there.  Both of them were

5    there.  They overheard the lies.  We have documents that show

6    the lies to the FDA to get out of this inspection.

7            So, they continue with Protocol-7, and what do you

8    have at the end of the day, because of the manipulation and

9    designing of the test and the falsification of data, you have

10   a completely inaccurate and unreliable test, a clinical trial,

11   that had nothing to do with measuring protection.  And you

12   don't have to take our word.  This whole presentation, our

13   whole summary judgment motion isn't based on our word.  It's

14   based on Merck's documents, the witnesses' testimony and their

15   own experts.  Their own experts support virtually everything

16   we're saying.

17           And so, I just want to walk through with you, just

18   take a minute, these are what Merck's witnesses and experts

19   have said about Protocol-7.  We'll start with Joe Antonello.

20   He's the chief biostatistician involved in Protocol-7.  What

21   he said is -- his words -- the precision of the test was "very

22   poor".  The test had "no clinical history expectation or

23   meaning".

24           Florian Schodel, very high up in Merck vaccine

25   research, this is what he said, "could not overemphasize the

Schnell - Argument                                    27

1    weakness of the test."  Another one of his quotes, "very

2    unreliable".

3           Emilio Emini, another high up executive in Merck

4    research called the test "very artificial".  David Krall,

5    again, the gentleman who designs the test and ran the test, we

6    asked him at his deposition whether the test was even

7    accurate.  He said, "that's beyond my expertise to answer."

8    The guy who designed the test and ran the test couldn't even

9    answer whether it was accurate.

10          We asked the same question to Merck's 30(b)(6)

11   corporate representative, Barbara Kuter, another executive

12   high up in Merck's vaccine research.  We asked if the testing

13   "had any relationship to protection from disease".  That's

14   what the whole point of the test was.  And her answer, "I

15   really can't answer that."  This is Merck's corporate

16   representative.  But it doesn't stop there.

17          We asked Marcela Pacetti, one of Merck's experts,

18   who specializes in this kind of testing, her words, "Protocol-

19   7 did not include a proper analysis of vaccine efficacy or

20   effectiveness."  That was the whole point of the test.

21   William Atkinson, another one of Merck's experts said this,

22   the testing "would not have really anything to do with

23   effectiveness."

24          This is what their own people are saying about the

25   clinical trial that they were using to support licensure of

Schnell - Argument                                     28

1    this Mumps vaccine.  Our experts are in complete accord with

2    these opinions.  David Kessler, who Merck's counsel

3    referenced, a former FDA Commissioner and who, until just last

4    week, was the Chief Science Officer for the Government's COVID

5    Task Force, said this about the test, his words, "a mess, with

6    no clinical relevance."

7            Peter Calcott, another one of our experts, who was

8    the head of quality for a major vaccine manufacturer said

9    this, "The test had no technical validity.  It was

10   meaningless."  There is undisputed evidence that Protocol-7

11   was essentially garbage, yet, Merck represented it to every

12   constituency in the opposite way, saying that it proved that

13   the vaccine at the lower potency was effective.

14           It's what they told the parents -- and this is all

15   in the record.  I can stop at any point to show you a

16   document, but it's all in our papers, and that's why we're

17   moving for summary judgment here, Your Honor.  It told the

18   parents of the children who were the subjects of the tests

19   that the test was going to show your child is protected.

20           It's what they told the doctors who were

21   administering the shots on these kids that the test is going

22   to show these kids are protected.  It's what they told the DOJ

23   when they were trying to get DOJ to dismiss this case several

24   years ago, that the test measured protection.  And it's what

25   they told the FDA in the clinical license applications, which

1    they were successful in getting because of these

2    misrepresentations.  And these same misrepresentations are

3    reflected in the label.

4            So here's what we know, because there's a lot of

5    talk about how great this vaccine is, right?  So here's what

6    we know about the Mumps vaccines that Merck has been selling

7    the CDC for the past 20 years.  There is no clinical data, at

8    all, supporting the level of protection this vaccine affords.

9    The only clinical data is from Protocol-7, and we heard what

10   their witnesses and experts said about that test.

11           What you haven't, also, heard from Merck's counsel

12   is this unprecedented resurgence in Mumps that has occurred

13   since 2006.  It is undisputed.  Nowhere in Merck's

14   presentation do they mention this.  All of these great figures

15   about the 99 percent reduction of disease are pegged to where

16   the disease was in 1995.  But if you look at from 2006

17   forward, it paints a very, very different picture.  And it's

18   own that the CDC, in its own words has said, "is of serious

19   public health concern."

20           In these public statements that Merck's counsel

21   represented about the FDA and the CDC trumpeting the vaccine,

22   those same public statements, as we pointed out in our summary

23   judgment papers, also raise the serious concern about the

24   Mumps resurgence that they're still trying to figure out what

25   the basis is for.  This concern is so severe that some of the

Schnell - Argument                              30

1    world's leading experts have called for a new vaccine.  One of

2    them is the FDA's Steven Rubin, perhaps, the FDA's leading

3    Mumps expert.

4              In writing a letter of support for NIH funding for

5    new vaccine research, this is what he said, the resurgence has

6    made "it quite clear that newer more immunogenic vaccines are

7    needed.  Dr. Biao He from the University of Georgia, who

8    received NIH funding for a new vaccine, said this, in his

9    application for the grant, "The resurgence underscores the

10   urgency for new and effective Mumps vaccines to replace

11   Merck's vaccines."  Stanley Plotkin, who is, I think, by all

12   accounts, the world's leading expert on Mumps, is calling for

13   a new vaccine.

14             So, yes, the vaccine, to a point, was doing a very,

15   very good job, but something happened, something, around the

16   same timeline as these potency failures happened, and now, we

17   have a very, very different product on the market.  But we

18   even asked Merck's witnesses -- we asked them, how is your

19   vaccine?  How effective is it?  It's something you would think

20   the manufacturer of the vaccine would know.

21             Dr. Krall, again, the designer of Protocol-7 and the

22   one who ran the lab testing it, we asked him, with all of the

23   testing that you've done with Protocol-7, how well does the

24   vaccine protect against Mumps.  We asked him that basic

25   question.  His answer, "I don't have an opinion on that."

1    This is the guy that ran the test to demonstrate that it

2    provided sufficient protection.  And we asked him the basic

3    question, does it work?  "I don't have an opinion on that."

4          Again, we asked Merck's corporate 30(b)(6)

5    representative, Barbara Kuter, we asked her the same question.

6    She -- that was one of the subjects she was there to testify

7    to.  She said she wasn't able to answer that.  She said, well

8    -- we asked if anybody at Merck could answer that, and she

9    said, "I don't know."

10         Also, as we stated in the papers, Dr. Krall, during

11   this testing, admitted to one of our Relators that the vaccine

12   didn't work as well and was going to lead to the resurgence

13   that we now see has happened.  There are also several internal

14   Merck documents that we've cited in our summary judgment

15   papers where Merck, itself, besides these witnesses who didn't

16   seem to have an opinion, they are internally questioning how

17   well the vaccine works.  They are raising concerns about how

18   well the vaccine works, and they're wondering if the 96

19   percent figure on the label really needs to be lowered to

20   reflect the actual protection that's provided.

21         So why is this a False Claims Act?  Where is the

22   fraud on the CDC?  Merck's counsel is absolutely right.  There

23   was a lot of fraud on the FDA, no question, but this is not a

24   fraud on the FDA case.  Merck has independent duties to the

25   CDC of full disclosure of any issues with the vaccine.  They

Schnell - Argument                                    32

 1    negotiated with the CDC under the -- it's all reflected in the

 2    Third Circuit's Mazur decision.

 3          But they negotiated with the CDC to protect

 4    themselves from product liability lawsuits.  They said, hey,

 5    we're exposed.  We need you to get out there if we're going to

 6    continue making this vaccine.  We can't be exposed to all of

 7    these product liability suits.  Vaccines are risky.  And the

 8    CDC agreed that it would take on that liability.  It would

 9    have the duty to warn the public about the benefits and risks

10    of vaccination.

11          But the CDC insisted on a reciprocal duty.  But you

12    need to warn us, the CDC said, if you have any issues with

13    your vaccine that might impact the benefits or risks that we

14    are responsible for now providing.  Merck negotiated that

15    duty.  They're trying to walk away from it.  They clearly have

16    a duty, but there are contractual duties, as well, and CGMP is

17    one of them.  It's not about, just, manufacturing.  It's about

18    assuring that your product has the potency and the protection

19    that you are claiming.

20          So, that's the essence of where the responsibilities

21    come.  So, what did Merck share with the CDC about any of what

22    I just said?  Absolutely nothing.  They didn't share that they

23    had original potency failures.  They didn't share that they

24    had to double the potency of the vaccine, something you'd

25    think the CDC would want to know.  They didn't share that they

1    had to double the potency of the vaccine.  They didn't share

2    that they continued to have pervasive potency problems after

3    they doubled the vaccine, so serious that internally for

4    years, they recognized they were out of compliance,

5    misbranded, non-marketable and potentially at risk of a recall

6    or not even being able to sell the product at all, all from

7    Merck's own mouth.

8         They didn't share the fraud they had to commit to

9    succeed with Protocol-7.  They didn't share that they

10   misrepresented the results of those clinical trials.  And I

11   want to focus on the clinical trials, because Merck's counsel

12   said, well, that's just between Merck and the FDA.  Absolutely

13   not.

14        Merck's own experts testified that what is a

15   critical input to CDC decision-making on whether to recommend

16   and purchase vaccines are the clinical trials that support

17   licensure.  That was Jonathan Temte, one of their main

18   experts, said their decisions on vaccine purchasing and

19   recommendations -- his words -- "largely depend" on the

20   clinical trials that the CDC is mandated to review as part of

21   that process.

22        William Atkinson, another one of Merck's experts,

23   said the same thing.  "The trial results" -- in his words --

24   "are critical information the CDC would need to understand in

25   making vaccine purchase decisions."

 1          Same thing with the label.  The label isn't just

 2   between Merck and the FDA.  As one of the Merck's witnesses

 3   said, and as reflected in the Mazur decision -- I'll start

 4   with that because it's clear.  In Mazur, the Third Circuit

 5   says, that, because of this duty to warn, the main audience --

 6   that's the Third Circuit speaking -- the intended audience of

 7   the label is the CDC, not the FDA.  It's the CDC because it

 8   gives them an understanding of what they're supposed to be

 9   able to explain to the public.

10          So, all of these omissions, all of these direct

11   misrepresentations, yeah, FDA, that was part of it -- that's

12   why it's in our briefs.  It tells you the extent to which

13   Merck had to go.  It shows their intent and their knowledge.

14   But this is about the CDC.  So, all of the fraud cases on the

15   FDA, the Nargle case, which is one of their favorite cases,

16   and another -- I can't even remember the names -- all of these

17   fraud on the FDA cases are completely irrelevant here, because

18   you did not have the same kind of direct responsibility to the

19   purchasing agency.

20          You have to show, in those cases, that the FDA would

21   have done something differently but for the misconduct at

22   issue.  That is not the case here.  We're talking about an

23   independent relationship with the CDC, independent duties,

24   independent contractual requirements.  These critical

25   omissions and misrepresentations that have gone on for years,

1    gone on for years, are the essence of why this is a False

2    Claims Act case.

3            The Third Circuit, in <u>Wilkins</u>, says that, False

4    Claims Act cases take many shapes, but what they all have in

5    common is either providing a product that the Government

6    didn't pay for or providing one that violates key contractual

7    regulatory or statutory obligations.  You have both here.  It

8    fits into the factual falsity rubric.  It fits into the

9    implied certification rubric, and it falls into the fraudulent

10   inducement.

11           What the CDC paid for was a vaccine that was free of

12   potency and protection issues, that met the label

13   specifications and the contract specifications that was backed

14   by accurate and reliable clinical testing, and that worked, as

15   well as Merck claimed, and on top of all that, with full

16   disclosure -- full disclosure of any issues or concerns that

17   Merck had about its vaccine.  The CDC got none of that.  This

18   is exactly the type of case the False Claims Act was designed

19   to cover.

20           So, now, let's talk about materiality, because I

21   think with the full understanding of the gravity of the

22   misconduct here, we can understand materiality.  We're not

23   just defending summary judgment on materiality.  What Merck's

24   counsel skipped over was the overwhelming and undisputed

25   evidence of materiality, so much so that we believe

1   materiality should be granted in our favor on summary

2   judgment.

3           None of this was discussed by Merck, so let me run

4   it through, because there are so many different factors.

5   First of all, who is in a better position to assess

6   materiality than the agency which was the subject of fraud?

7   The CDC is.  And the CDC has spoken in this case on several

8   occasions.

9           First off, twice, the CDC injected itself into this

10  case with a letter that had to do with discovery and

11  authorizing 30(b)(6) witnesses.  And the letter from the

12  Director of the CDC, and then there was a follow-up by the

13  Deputy Director, said this, the CDC has a "clear interest" in

14  the outcome of this case, because it is "critical" that they

15  receive accurate information from vaccine manufacturers.

16          If that doesn't answer the materiality question by

17  itself, I'm not sure what will, but we have a lot more from

18  that.  We have the United States, which, on numerous

19  occasions, has injected itself into this case.  Yes, they

20  didn't intervene so many years ago.  But when they didn't

21  intervene, they made a point of saying, it had nothing to do

22  with the merits.  There are many reasons why the Government

23  doesn't intervene.

24          And in the statement of interest they filed,

25  challenging one of -- Merck was trying to get them to dismiss

1    the case.  Instead, they filed a statement of interest

2    rejecting Merck's main argument for dismissal.  And in that

3    statement, they said, the United States is the real party in

4    interest here, and we have a "strong interest" in the outcome

5    of this case.

6              As you know, they also filed a statement of interest

7    in summary judgment on the very issue of materiality, and Mr.

8    Sweet will likely speak to what their positions are on that.

9    But if I can encapsulate them, I would point out that, first

10   of all, they made it very clear, the United States, that Merck

11   is applying the wrong standard on materiality.  And what they

12   also said is that, the Government's continuing purchases, in

13   this context, where there is no actual knowledge, you have

14   mere allegations.  They know that.  Maybe they even have a

15   strong suspicion of wrongdoing, but that's not the standard

16   under Escobar.  It's actual knowledge.  They don't have actual

17   knowledge, and that comes clear from the statement of

18   interest.

19             And, finally, in the statement of interest, the

20   Government made it clear that even if the CDC did have actual

21   knowledge, it doesn't undermine materiality in situations like

22   this, where there are serious public health and safety reasons

23   why you might want to continue purchasing here.

24             What are those reasons here?  Mumps vaccines, until

25   just a few months ago, when GSK finally was able to get into

Schnell - Argument                                    38

1    the market, but up until, for the last 50 years, Merck was the

2    only source for Mumps vaccine.  So if the CDC stopped

3    purchasing Merck's vaccines, they would have no Mumps vaccines

4    at all.  But even worse than that, you can't buy a Mumps

5    vaccine alone.  It only comes in a combination vaccine with

6    Measles and Rubella.

7              So, if the CDC did what Merck said they should have

8    done, if they cared about this case, they would had to cut off

9    vaccinating millions of children a year for Measles, Mumps and

10   Rubella.  That doesn't give us any indication that they

11   continued to buy it, even if they had actual knowledge, which

12   they clearly did not.

13             But the DOJ issue doesn't stop there.  We have cited

14   numerous False Claims Act cases, which Merck's counsel

15   dismisses as irrelevant but they are entirely on point.  You

16   know, the mine run of cases language from Escobar is exactly

17   this.  There have been -- we cited a half a dozen in our brief

18   where the very facts at issue -- well, not the very facts.

19   This is a very unique case.  But the same kind of misconduct

20   at issue was enough for the Government to bring False Claims

21   Act enforcement actions against these defendants.

22             And I just want to highlight two of them.  One is

23   the McKesson case, which we cite in our papers.  That involved

24   CDC vaccine contracts under the Vaccine for Children Program,

25   the same program here.  It involved misconduct that impacted

Schnell - Argument                    39

1    the potency of the vaccine.  And in successfully settling the

2    matter, this is what the DOJ said, "Insuring the integrity and

3    performance of Government contracts is paramount, especially

4    when it impacts programs intended to protect young children,"

5    the same program at issue here.  How is that not relevant to

6    this case and the assessment of materiality?  Merck does not

7    say.

8         The other case I want to highlight is the <u>Shire</u>

9    case.  That was about a drug maker selling drugs that lacked

10   clinical data -- sounds familiar -- and overstating the

11   efficacy, exactly what's going on here.  In successfully

12   settling that case, this is what DOJ said, "We will be

13   vigilant to hold accountable pharmaceutical companies that

14   provide misleading information regarding drug safety and

15   efficacy," exactly the issues on the table here.

16        But there is more, Your Honor.  <u>Escobar</u> speaks to

17   the essence of the bargain.  The essential inquiry in a

18   materiality assessment is the violations or the

19   misrepresentations, omissions, do they go to the essence of

20   the bargain?  Effectiveness is the core essence of these

21   vaccine contracts.

22        Their own experts admit -- and, I mean, it's not a

23   far cry.  You don't even need evidence, it's such a

24   commonsensical point.  But if we needed evidence, we can just

25   look at their expert, Dr. Atkinson.  This is his quote -- and

1    he was an expert who previously worked at the CDC -- "Vaccine

2    effectiveness is obviously kind of the most important thing we

3    deal with."

4          We can look at Merck's own papers.  I don't know how

5    they make this argument, and then have this in their papers,

6    but they do.  Their opposition papers at page 29, this is

7    their quote, "CDC considers vaccine effectiveness the most

8    important factor when evaluating vaccines."

9          This entire case is about effectiveness, potency and

10   protection -- effectiveness.  They admit it.  It's the essence

11   of the bargain, a clear indicia of materiality.  But there's

12   one more, and that's that the contract's provisions that we're

13   talking about, the violations that we're talking about weren't

14   just conditions of payment, and we spell this out in our

15   brief.  They were actual prerequisites for purchase.

16         Merck's counsel says we have no evidence.  She's

17   ignoring all the testimony that we got from the CDC.  The CDC

18   witnesses, both the ones that were the 30(b)(6) witnesses that

19   the CDC produced, and the Merck experts, who were former CDC

20   employees, they were uniform in saying that violations dealing

21   with potency and protection, which are covered under CGMP, are

22   prerequisites to purchase.  Following CGMP is a requirement of

23   -- it's in the contract.

24         And these witnesses were clear that if you're not

25   violating -- if you are violating CGMP, we're not going to

Schnell - Argument                                    41

1    contract with you.  Even fraud, one of Merck's -- I'm sorry --

2    one of the CDC's 30(b)(6) -- oh, no, no, this was one of

3    Merck's experts, Mr. Nichols -- or Dr. Nichols -- I don't

4    remember -- he said that -- we asked, well, if one of your

5    vendors committed fraud, would the CDC deal with them?  I

6    mean, let's just deal with common sense so stay that none of

7    this would matter.  And he said, "I don't think CDC would have

8    wanted to contract with a vendor found guilty of committing

9    fraud."  This is their own experts who are backing this up.

10           So, we have the CDC speaking.  We have the

11   Department of Justice speaking.  We have the prior FCA

12   actions.  We have the essence of the bargain, and we have

13   prerequisites for purchase, which are way more material than

14   conditions for payment.  All of them undisputed from the

15   documents -- Merck's own documents, Merck's own papers,

16   Merck's own experts and the CDC witnesses.

17           So, let's talk about what they do talk about.

18   They're real focused on materiality.  They throw that out on

19   the side and give it short shrift.  And what they focus on,

20   instead, is the decision of the CDC to continue purchasing.

21   Well, I already spoke about, it's the only vaccine available

22   up until a few months ago.  You couldn't buy it unless they --

23   couldn't stop purchasing it unless they also got rid of

24   Measles and Rubella.

25           So, what they're really asking for, Your Honor, is a

Schnell - Argument                                    42

standard by which, if the Government gets a sniff or a whiff

or even a suspicion of fraud, regardless of the product,

regardless of the underlying circumstances, regardless of the

availability of alternatives, they better stop purchasing or

do something or they're going to lose their rights under the

False Claims Act.  Do you know what a dangerous precedent that

would set?  No court has ever adopted that.

They cite a bunch of cases.  Not one of them deals

with even a fraction of the facts at issue here with the type

of product, bundled with another product, with all of these

materiality evidence that we set forth.  Virtually all of them

deal with situations where lack of materiality was conceded or

the Government came out and said that we don't care about this

case.  Very, very, very different than here.

And I think one of Merck's documents really speaks

to this continued purchases argument the best.  It was one of

their consultants.  They called the CDC and all of the other

captive purchasers of Merck's Mumps vaccine, in their words,

Merck's consultant, customers by force, not by choice --

customers by force.  And that tells you a lot about the

predicament the CDC has been in.

I want to talk  -- because a lot of their focus is

on this submission that Dr. Kessler made.  What they haven't

said is that they made their own submissions, two submissions

actually, to rebut Dr. Kessler's position.  And in those

Schnell - Argument                                        43

1  submissions, they, essentially -- I don't want to speak too

2  strongly, but I'm going to say it like I see it.  They are

3  continuing to perpetuate the fraud on the CDC that has been

4  going on throughout this whole case, and I'll tell you why.

5         It's not just that they continued to say that their

6  vaccine is safe and effective, even though they have no

7  clinical data supporting that.  And it's not just because they

8  urged the Government to not take any action, even though they

9  said that.  It's this, in the very submission to the CDC and

10  the FDA to rebut Dr. Kessler, they relied on the very

11  falsified data that's at issue here.

12         And if you want to see it, it's Exhibit 205 -- Merck

13  Exhibit 205 at pages 47 and 48.  The Protocol-7 data that we

14  have already seen was garbage and falsified, they relied on

15  that to make their point that there's no case, here, so this

16  is the fraud that's continuing.

17         They've also, I told you earlier, told the DOJ what

18  Protocol-7 was about and didn't tell the truth on that either.

19  So this is continuing.  This is not something to put the

20  Government on actual notice.  Not only did they provide the

21  falsified data, but they actually said that this demonstrates

22  that the Mumps vaccine still provides protection.

23         So that's the materiality story in its entirety,

24  filling in the major gaps that Merck left out.  Let's talk

25  about the effectiveness part, now, because they bandy about --

1    I mean, they had this nice chart that you saw which shows this

2    precipitous drop.  We've already talked about that.  It's

3    pegged to 1995.  They don't really -- and it's on a scale that

4    you don't really see what happens after 2006.  In our reply

5    brief, we do our own chart, which shows what happened from

6    1995.  We kind of continue it on.  And you see, it goes in

7    the opposite direction with huge spikes.

8           So, let's forget about this 99 percent drop, because

9    that's meaningless, at this point, since 2006.  But let's talk

10   about the 88 percent figure, because that's more current.

11   And, yes, the FDA and the CDC are quoting to that number.  But

12   let's talk about what that number is.

13          That's not an average.  It's a median.  It's in the

14   middle.  And even their own slide, at page 11, shows what it

15   is really is.  It's a range.  And the range that they have on

16   their slide is 32 to 95 percent.  So it's a range with a

17   lower bound and an upper bound.  And that lower bound, since

18   2006, keeps getting lower.  It started at around 75 percent.

19   Then it dropped into the 60s, and now, it's in the 30s.

20          What does that tell you, Your Honor?  It tells you

21   that, yeah, some of these vaccines may be 95 percent

22   effective.  Maybe a lot of them are 88 percent effective.

23   Some of them are only 30 percent effective, and we don't know

24   which ones are which.  We don't know which -- which vaccine

25   you give to this kid.  We don't know if it's the one that's 30

Schnell - Argument                    45

1    percent -- and it's probably going to keep getting lower -- or

2    if it's the 95 percent.

3            You know, here, CDC, here's all these vaccines.  Can

4    you imagine an auto supply company selling brakes to the

5    Government and saying, yeah, 90 percent of these brakes work,

6    but, you know, around ten percent, we're not so sure.  We

7    don't know which ones.  Is the Government going to buy those

8    from that supplier?  No way.  And that's what's going on here,

9    and that's why CGMP and adequate assurances and the

10   adulteration statutes are so critical, but Merck keeps

11   skipping over that.

12           The potency failures, and the record is full of it

13   -- we can show you a dozen documents -- Merck statistically

14   predicted that up to eight percent of their vaccines were not

15   going to comply with the potency specifications for the full

16   shelf life.  That's what raised the alarm, their statistical

17   certainty.

18           And this wasn't some one-off statistician.  This was

19   done over many years, covering many different lots.  There was

20   a statistical certainty that up to eight percent of the lots

21   were going to fail, and that's why they were fearing a recall.

22   None of it shared with the FDA.  That's why they were fearing

23   a recall.  That's why they called their product non-marketable

24   and misbranded and out of compliance.  And that's why this

25   Protocol-7 -- it's not just some clinical trial that means

Schnell - Argument                                    46

1    nothing.  It means everything.  But for that clinical trial,

2    their market -- if anybody had found out about it, that

3    product would have been pulled.

4          So, how does this relate to the 88 percent

5    effective, some kids getting a 30 percent good shot, probably

6    lower; some getting a 95 percent, and we don't know which one,

7    Merck acknowledging, internally, at the highest level that

8    eight percent are going to fail?  That's what adequate

9    assurances have, and they don't have that with this vaccine.

10         All of these other comments that are in their

11   briefs, the second-guessing of the agency, you know, the -- I

12   mean, there's so many that -- potency isn't part of the case.

13   Efficacy and effectiveness are different.  It's all a

14   distraction from the key issues in this case.

15         There is a serious problem, a serious problem.  If

16   you could read the 500-page expert report of Dr. Kessler, you

17   could see why he is so concerned.  In his -- and if you listen

18   to his deposition, he's shouting from the rooftops that

19   something needs to be fixed here.  This is a staple of the

20   American Vaccination Program, and no one has any idea what's

21   going on.  And we have all the evidence to show what's behind

22   it, and they've shared none of it with CDC.

23         If there wasn't a stronger case under the False

24   Claims Act, I don't know what there would be.

25               THE COURT:  Counsel?

1          MR. SWEET:  Your Honor, I have some comments on

2     materiality, as well.  It might be better if Merck can speak

3     after, and they can respond to anything I have to say?  Thank

4     you.

5          Your Honor, I'm going to speak for a few moments

6     about the Government's position here.  I am limiting my

7     comments to the subject in the Government's statement of

8     interest.  And the Government takes no view on the sufficiency

9     of the evidence in this case, but we do have a lot to say

10    about the interpretation of materiality and the legal issues

11    that are raised in the parties' briefs.

12         First, I just want to point out, because I think

13    it's always good to start with the statute, itself.  There's a

14    definition of materiality in the False Claims Act.  And I am

15    citing to the Escobar case specifically has the definition as,

16    "having a natural tendency to influence or be capable of

17    influencing the payment or receipt of money or property."

18         That definition doesn't appear in Merck's

19    presentation, but I think it's important to start there.  The

20    Government's knowledge is critical here.  And, again, it's

21    been pointed out by the parties that Escobar, which is the

22    Supreme Court case, which really defines materiality and

23    addresses the materiality prong, Justice Thomas specifically

24    talks about where the Government has actual knowledge and what

25    the Government's conduct is after actual knowledge.

Sweet - Argument                                    48

1           I have some examples, if the Judge wants later at

2    some point, about what actual knowledge could mean for the

3    Government.  But, at this point -- and the Government has

4    knowledge of accusations, of allegations by Relators.  The

5    Government does not have actual knowledge.  And allegations,

6    alone, has little relevance to the materiality inquiry under

7    the False Claims Act.

8           Merck states, throughout its briefing, that the

9    Government must have concluded that Relators' allegations are

10   untrue or otherwise not material, because the Government has

11   actual knowledge of all of the facts and all of the evidence

12   relating to this matter.  That's just not true.

13          Merck's effort to represent that the Government

14   knows, and to interject that conjecture into the materiality

15   analysis is incorrect as a matter of law.  The Government has

16   knowledge of the allegations made by the Relators.  The

17   Government has not made any determination or drawn any

18   conclusions --

19          THE COURT:  Well, there's a big difference between

20   knowing allegations, and all I know is the allegations, and

21   the Government stopping there and saying, all I know is the

22   allegations, and absolute knowledge over here.  You can't

23   stand up here -- or are you standing up here and saying, the

24   FDA and the CDC did not have any of this information, did not

25   explore it?

1          My understanding is the Government explored it for

2     two years.  So that's knowledge.  Now, you want to tell me,

3     actual knowledge versus allegations?  Certainly, you knew more

4     than allegations.  And the Government knowing allegations,

5     stepped in and did discovery, decided not to intervene, which

6     is fine.  It's not the case -- it's not the end of the case.

7          But, certainly, they made a due diligent look at

8     what's going on, because they're protecting the people, the

9     very people that are going to get these shots.

10          MR. SWEET:  Your Honor, I'm glad you raised this.

11     The Government --

12          THE COURT:  So, I'm reading <u>Escobar</u>, too.

13          MR. SWEET:  Yeah, Your Honor, the Government --

14          THE COURT:  You're right, that's the case.  They

15     don't mention the statute, but they mention <u>Escobar</u>, which

16     defines it.  So I read it, and the definition of materiality

17     is right there.

18          MR. SWEET:  That's correct, Your Honor.

19          Let me speak to Your Honor's comments about what the

20     Government knows and what the Government doesn't know.

21          THE COURT:  Yeah, but more than allegations, though.

22          MR. SWEET:  The Government knows allegations.  The

23     Government knows --

24          THE COURT:  And they can't say, like, Sergeant

25     Schultz, I know nothing now.

1          MR. SWEET:  We didn't say we know nothing now.

2          THE COURT:  That's what I was hearing you saying.

3          MR. SWEET:  The declination, the Government's

4    decision -- the Government investigated.  They --

5          THE COURT:  When she said -- counsel says, they know

6    all this.  They know all that -- we put it in front of them to

7    let them investigate.

8          MR. SWEET:  I think that says a lot about --

9          THE COURT:  And they continued to buy.  So it says a

10   lot about, what?

11         MR. SWEET:  Your Honor, if I can?  If I may, there's

12   a lot to say about -- in response to Your Honor's comments,

13   and I appreciate Your Honor's comments.  I think they're right

14   on the mark.

15         In 2012, the Government declined to intervene, based

16   on allegations in the original complaint.  On the very same

17   day, in April of 2012, the Relators filed an amended

18   complaint.  The amended complaint had new allegations.  The

19   amended complaint, then, went into discovery.  There was years

20   and years of discovery.  The Government was aware of some of

21   what was happening.  The Government participated in some of

22   what was happening.

23         But the Government did not take this case on.

24   Again, we did not intervene in the case.  We were not counsel

25   to the case.  We did not digest every bit of evidence.  We

1   watched as the case progressed.  And, under the False --

2            THE COURT:  And the Government is, who?

3            MR. SWEET:  -- Claims Act, Your Honor --

4            THE COURT:  The Government is, who?  The Government

5   is the FDA?

6            MR. SWEET:  The Government, in this case --

7            THE COURT:  Is the Government the CDC?

8            MR. SWEET:  Well, Your Honor, that's the point.  The

9   Government is a lot of things.

10           THE COURT:  Right.

11           MR. SWEET:  Right.  The Government is the FDA.  The

12  FDA may know certain things.

13           THE COURT:  So, you're --

14           MR. SWEET:  The CDC may know certain things.

15           THE COURT:  So, are you representing what the FDA

16  knew?  Are you representing what the CDC knew or followed

17  during that period of time?

18           MR. SWEET:  Your Honor, I'm saying that the

19  Government's collective knowledge is expressed through the

20  Department of Justice, and the Department of Justice is the

21  party that speaks in court for the United States.

22           THE COURT:  All right.  And that's good, and I

23  understand that.

24           MR. SWEET:  And -- and, Your Honor --

25           THE COURT:  But I'm looking at Escobar, which looks

1    at a holistic approach of materiality.

2              MR. SWEET:  Correct.

3              THE COURT:  So I understand that you're saying,

4    look, take with a grain of salt when it's mentioned that the

5    Government knew something.  So they knew something, but what

6    did they know?  But the Government is coming up here and

7    saying, collectively, we know nothing?

8              MR. SWEET:  No.  No, Your Honor, I never said

9    nothing.

10             THE COURT:  All right.  So, what did you know?

11             MR. SWEET:  Your Honor, we knew all sorts of -- we

12   followed the case.

13             THE COURT:  So you followed the case, okay?

14             MR. SWEET:  So, when Merck says, the CDC and FDA,

15   and I'm quoting here, "have all of the evidence to evaluate

16   it", and they say that, "the DOJ, CDC and FDA know the

17   entirety of Relators' falsity claims, including every

18   pertinent piece of evidence that Relators say was withheld

19   from the agency" -- that's at page two of their response to

20   our statement of interest -- that's just simply not true.

21             THE COURT:  It's hyperbolic, they call it.

22             MR. SWEET:  Well --

23             THE COURT:  They know all, but in other words, they

24   have access to all.  They were invited into all.  What they

25   knew, the DOJ is not going to say, we knew all.

1          MR. SWEET:  Your Honor, no agency is all knowing.

2          THE COURT:  Exactly.

3          MR. SWEET:  Okay.  This case progressed --

4          THE COURT:  Exactly.  Welcome to a courtroom, where

5     there's hyperbolic statements.

6          MR. SWEET:  Well, Judge, it's hyperbolic, but it's

7     also the basis for saying that there's no materiality.

8          THE COURT:  It is one basis for saying that, but

9     it's not -- but you can't come up here and say, we know

10    nothing.

11         MR. SWEET:  I didn't say that, Your Honor.

12         THE COURT:  Well, I heard that allegation.

13         MR. SWEET:  I said we know allegations.

14         THE COURT:  What do you know?  So you know some

15    things, but you don't know what those things are?

16         MR. SWEET:  Your Honor, I can't -- I can't cite to

17    you, right now, every piece of evidence we know.

18         THE COURT:  Right.

19         MR. SWEET:  We have had a lot of information

20    available to us.

21         THE COURT:  Right.

22         MR. SWEET:  We've had -- we've had CDC witnesses

23    deposed.

24         THE COURT:  Right.

25         MR. SWEET:  We've had discussions with the FDA, and

1    I'm not going to get into everything that we have internally

2    discussed.

3            THE COURT:  Right, because it would take us three

4    days to go through it.

5            MR. SWEET:  That's right, Your Honor.

6            THE COURT:  Right, okay.

7            MR. SWEET:  But, on the other hand, to suggest that

8    the Government has full knowledge of every fact --

9            THE COURT:  I agree with you.  We're on the same

10   page.

11           MR. SWEET:  Okay.  Your Honor, let me just continue

12   on this issue, because this is where it goes from.  I think

13   we're on the same page that there is a difference between

14   actual knowledge and knowledge of allegations, so I'll give

15   you some examples, Your Honor.

16           THE COURT:  Wait a second.  There is, and we agree,

17   but actual knowledge, you had actual knowledge to a lot of

18   things, and you're saying, Judge, I'm not going to spend three

19   days telling you what I have actual knowledge to.

20           MR. SWEET:  Well, Your Honor, actual knowledge of

21   the falsity of the -- of the -- whether there is falsity.

22   That includes quite a lot of information.  And, at no point

23   since -- I'm not going to get into the Government's internal

24   deliberations, but this case has been going on for years.  The

25   evidence has been developed over years.  Testimony has been

1    taken.  Experts have come in.  I cannot say -- I cannot

2    represent --

3              THE COURT:  Right, right.  Look, I understand.  I

4    understand what you're saying.

5              MR. SWEET:  -- that the Government has distilled and

6    synthesized everything, and said, all of the information has

7    come to the Government, and we take this position.  We know

8    all.  We are watching this case as it develops, and that is

9    how the False Claims Act is designed.

10             The False Claims Act is designed to allow the

11   Government to do an investigation.  It doesn't require that we

12   make a decision on the merits, and then we can decide to -- we

13   can elect to intervene or decline.

14             We declined the original complaint in 2012.  That's

15   the point where discovery took off, and we were -- the

16   Government is allowed to -- in fact, that is the design of the

17   False Claims Act, to allow the Government to rely on Relators

18   and their counsel to develop a case and try to put it on in

19   court.

20             THE COURT:  I understand that.  And I understand

21   what you are saying about actual knowledge.  I don't know that

22   I agree with you.  I am reading <u>Escobar</u>.  The DOJ can read

23   whatever it wants.  You can come here and say, look, we're out

24   of the case, but you know what, we let it go on for ten years

25   and follow it.  So, therefore, actual knowledge, DOJ, under

1    those circumstances, we'd never have actual knowledge.

2            MR. SWEET:  I can give you --

3            THE COURT:  I'm assuming, if you have actual

4    knowledge that this was causing a disease in children, you

5    would have come in and said, look, we're stopping this --

6            MR. SWEET:  Well, Your Honor --

7            THE COURT:  -- right?

8            MR. SWEET:  -- let me -- let me get to that, because

9    the FDA's issues, and I think there was kind of a hit at the

10   FDA about its obligation to inform the public about safety

11   issues.  This case is not about safety issues.  The FDA looks

12   at safety and effectiveness.  This case is about

13   effectiveness.

14           So I think it would be wrong to suggest --

15           THE COURT:  Thank you, that -- that's --

16           MR. SWEET:  -- and Merck's counsel did suggest --

17           THE COURT:  -- counsel for defendants, if you

18   listened carefully, said it was about safety and

19   effectiveness.

20           MR. SWEET:  Well --

21           THE COURT:  But you're saying it's about

22   effectiveness.

23           MR. SWEET:  Well, yes, and I'm saying that --

24           THE COURT:  Yes.  But counsel was saying, look, if

25   they're saying about safety, you had a responsibility to tell

 1   the public.

 2            MR. SWEET:  That's correct.

 3            THE COURT:  And you didn't tell the public, because,

 4   Judge, it's about effectiveness.

 5            MR. SWEET:  That's correct.

 6            THE COURT:  Right, okay.

 7            MR. SWEET:  Okay.  So the FDA is not falling on its

 8   obligations, here, because there is no safety issue; it's an

 9   effectiveness issue.

10            THE COURT:  Okay, good.

11            MR. SWEET:  Your Honor, if I can, I could give you a

12   few examples --

13            THE COURT:  We're on the same page with that.

14            MR. SWEET:  Because Your Honor is interested in this

15   knowledge issue, I'll give you a few examples of actual

16   knowledge, because there are plenty of cases in which the

17   Government, in a False Claims Act, after investigation, has

18   actual knowledge.

19            One example, self disclosure.  We have a lot of

20   defendants who come in and self disclose.  Then we have actual

21   knowledge.  We have discrete cases --

22            THE COURT:  Wait a second.  Wait a second.  We can

23   do all the generics you want about cases here and cases there,

24   all right?  Counsel is saying, look, they had knowledge of

25   this Protocol-7 and the issues.  The FDA came in, and they

1    worked with us with the issues.

2          They knew about the release potency versus the --

3    the discrepancy between the release potency and 24-month

4    potency.  FDA had actual knowledge of that.  They came in, and

5    they looked at it.  The CDC, even though they were not dealing

6    directly, came in, had actual knowledge of that.

7          Are you saying that the DOJ, even though they had

8    actual knowledge of that, the DOJ had no actual knowledge of

9    that?

10          MR. SWEET:  Your Honor, what I am trying to say is

11    that it's a matter of this argument on materiality --

12          THE COURT:  Yes.

13          MR. SWEET:  -- the suggestion that the Government

14    had actual knowledge of all of the evidence and all of the

15    pertinent records --

16          THE COURT:  I agree with you.  That's out the door.

17          MR. SWEET:  Well, that's all I'm saying.

18          THE COURT:  Okay, good.

19          MR. SWEET:  That's what I'm -- so let me move

20    forward.

21          THE COURT:  Then we're done.  What else do you have

22    to say?

23          MR. SWEET:  A few more things, Your Honor, if I may?

24    And I can give you more examples of actual knowledge, but I

25    think Your Honor has that issue, so --

Sweet - Argument                          59

1                THE COURT:  I have the issue, and I am drilling down

2    on the issue.

3                MR. SWEET:  Okay.

4                THE COURT:  Actual knowledge, the FDA, what did they

5    have actual knowledge of?  They had actual knowledge of the

6    problem.

7                MR. SWEET:  Okay.

8                THE COURT:  That's what the argument is.

9                MR. SWEET:  So, Your Honor, all of the statements in

10   Merck's brief concerning -- and there were so many of them --

11   where materiality is based on continuing purchases, the

12   failure to -- of the CDC to negotiate --

13               THE COURT:  Continuing purchases, that's <u>Escobar</u>.

14               MR. SWEET:  That's <u>Escobar</u>.

15               THE COURT:  Right.

16               MR. SWEET:  But there are other similar Government

17   action and inaction that fall in the same category.  For

18   example, they raised the issue of the CDC's failure to

19   negotiate the price of the vaccine once they became aware of

20   the issue.  They raise other issues of the Government's action

21   and inaction.  They raise out of state -- out of Court

22   statements by FDA officials concerning effectiveness.

23               All of that, Judge, is presumptuous.  All of that

24   are conclusions.  They do not have knowledge -- they do not

25   have a basis to know why the Government did what it did.  And

1    our statement of interest specifically addresses that.  The

2    FDA may act for all sorts of reasons.

3              THE COURT:  They may, but, again, <u>Escobar</u> is saying,

4    strong evidence.  It's not the end of the case.  It's strong

5    evidence that, hey, the FDA comes in; they look at this.  The

6    CDC comes in.  Actual knowledge as to the testing problem.

7    The Whistle Blowers come in and say, look, there's a problem

8    here.  Okay, we're going to come in and look at it, and then

9    the Government acts.

10             So, and then the Government acts, but then they say,

11   like, the FBI, we never make a determination.

12             MR. SWEET:  Your Honor, we are on --

13             THE COURT:  It's like the DOJ, we never make a

14   determination.  We wait until the --

15             MR. SWEET:  Your Honor --

16             THE COURT:  -- the jury decides or the judge, but I

17   get that.  We're on the same page.

18             MR. SWEET:  We're on the same page with that, as

19   well, Your Honor.

20             THE COURT:  Right.

21             MR. SWEET:  All of this Government action can be --

22             THE COURT:  Or inaction.

23             MR. SWEET:  -- or inaction can be driven by

24   numerous --

25             THE COURT:  Or whether they'll wait and see for 12

1    years.

2              MR. SWEET:  Well, it could be driven by numerous

3    other factors.

4              THE COURT:  But we'll continue to buy the product

5    while we wait and see.

6              MR. SWEET:  But to conclude, and that's the -- look,

7    Merck brought a summary judgment --

8              THE COURT:  To conclude, what?  I like that word.

9              MR. SWEET:  Merck brought a summary judgment motion

10   saying that all of this Government action should show the

11   Court that there is materiality.  All we're saying is exactly

12   what Escobar and Your Honor says.  It's evidence.

13             THE COURT:  Right.

14             MR. SWEET:  It's not conclusive.

15             THE COURT:  It's not.

16             MR. SWEET:  Okay.  Your Honor, I think you've got

17   it, so I'm not going to belabor a lot of my argument here

18   other than to say -- well, one more thing.  Declination, it's

19   come up over and over with respect to materiality.

20             The Government's decision to decline to intervene in

21   the case is completely irrelevant to materiality.

22             THE COURT:  I absolutely agree.

23             MR. SWEET:  Okay.  And the Third Circuit's Chief

24   Judge Smith just spoke to this recently.

25             THE COURT:  I always agree with the Third Circuit.

Sweet - Argument                                    62

1          MR. SWEET:  Okay, Judge.

2          THE COURT:  Even when I disagree.

3          MR. SWEET:  I understand, Your Honor.

4          THE COURT:  I only let them know that in the

5  elevator.

6          MR. SWEET:  I have the same practice.  And I'd just

7  point out, Your Honor, that declined cases, the Government has

8  collected since 1986, I think, 3.5 billion dollars in declined

9  cases.  The Government supports declined cases.  The fact that

10 we decline is not a suggestion that we're commenting on the

11 merits of the case.

12         THE COURT:  I whole-heartedly agree.

13         MR. SWEET:  Okay.  Judge, with the benefit of our

14 intern from Drexel Law School, Mary Rose Babcock, in the back

15 of the courtroom, we have a number of Circuit Court cases, and

16 we left them at Circuit Court cases --

17         THE COURT:  So, let me say hello to Mary Rose

18 Babcock.  Very good job.  We love Drexel.  Drexel sends some

19 very nice students down here, so.

20         MR. SWEET:  And her first assignment working with us

21 this semester was to go back and look for Circuit Court cases

22 that address these issues, the materiality issue, since the

23 time we filed our statement of interest in 2000, right, a few

24 years have passed.

25         So there are a few cases, if -- Your Honor, I can

Sweet - Argument                                63

1    tell you what they are now or I can submit a submission, a

2    letter, but there are several Circuit Court cases, all of

3    which support -- they would seem to support the suggestion --

4    the issue here that Government action or inaction, continuing

5    sales, do not -- are evidence of materiality, and that

6    evidence, unless there is no evidence on the other side,

7    should go to a jury, and that there are many, many reasons

8    that the Government may act, despite having knowledge, actual

9    knowledge, even, of allegations.

10            THE COURT:  So --

11            MR. SWEET:  Yes?

12            THE COURT:  -- I just feel like you're an advocate

13   on this side, for the other side, even though you don't know

14   nothing.

15            MR. SWEET:  Your Honor, I'm an advocate --

16            THE COURT:  It sounds like an advocacy position --

17            MR. SWEET:  Your Honor --

18            THE COURT:  -- for the plaintiffs, even though "I

19   know nothing".

20            MR. SWEET:  Your Honor --

21            THE COURT:  In other words, you're preserving, hey,

22   if they're going to get a few bucks, we get a few bucks, too.

23   I don't understand what's going on here.

24            MR. SWEET:  Absolutely not, Your Honor.  I'm an

25   advocate for the statute being interpreted properly.

Sweet - Argument                                    64

 1            THE COURT:  Yes, and so, I -- I agree.

 2            MR. SWEET:  Okay.

 3            THE COURT:  It should be interpreted properly.

 4            MR. SWEET:  And so, there are a few other cases,

 5    Wolf Creek Federal Services, the Sixth Circuit Court of

 6    Appeals, Yates vs. Pinellas Hemotology and Oncology, the 11th

 7    Circuit --

 8            THE COURT:  But materiality doesn't go to the jury

 9    every time.

10            MR. SWEET:  That's correct, Your Honor.

11            THE COURT:  All right.  So we're on the same page.

12            MR. SWEET:  But it would seem to me that the issue

13    of materiality would go to the jury unless the Court were to

14    find that no reasonable juror could find for the non-movant in

15    this case.

16            THE COURT:  Correct, I agree.

17            MR. SWEET:  Your Honor, unless you have any

18    questions, finally, to conclude, the United States speaks

19    exclusively for the -- I'm sorry -- the Department of Justice

20    speaks exclusively for the United States in this case.

21            The Department of Justice has an established

22    statutory authority, an established criteria to -- when it

23    should intervene in a case and move for dismissal of the case,

24    when it's in the Government's best interest.  That has not

25    happened here.

1          THE COURT:  Well, listen, the Government could have

2     stayed in, and they could have been an Intervener, and the

3     question, still, of materiality is still on the table,

4     wouldn't you agree?  Even if you stayed in, and you said,

5     Judge, it's material, I might say, it's not material.

6          MR. SWEET:  Absolutely, Your Honor.

7          THE COURT:  All right.  So we're on the same page.

8          MR. SWEET:  I think we are.

9          THE COURT:  Yes.

10         MR. SWEET:  Any further questions, Your Honor.

11         THE COURT:  No, you did great.  And thanks to the

12    Drexel student for putting all of those -- did you interview

13    for a new internship the day after you got the assignment?

14        (No audible response.)

15         THE COURT:  I don't know how much further we can go

16    on this.  I know that you have some rebuttal, and you saved

17    five minutes, but counsel took all 20 minutes of your five

18    minutes.

19         MS. ELLSWORTH:  Could I have three minutes, Your

20    Honor?

21         THE COURT:  I'll give you five minutes.  Go ahead.

22    Because we have another argument after this, you know.

23         MS. ELLSWORTH:  Well, let me start with what I think

24    was the most interesting thing that I heard today, which is

25    that all --

1          THE COURT:  Something I said, I hope?

2          MS. ELLSWORTH:  Hopefully, it's something you will

3    say.

4          I told you that effectiveness was the most important

5    factor for the CDC.  Relators' counsel stood up and told you,

6    effectiveness data is the most important factor for the CDC,

7    and then the United States stood up and told you,

8    effectiveness is the most important factor to the CDC.

9          Well, if you want to talk about actual knowledge,

10   the CDC develops its own effectiveness data.  Merck has

11   nothing to do with that.  It is between the CDC, and the State

12   and local health officials, and the CDC has known that the

13   effectiveness data shows an 88 percent median effectiveness

14   rate, and it hasn't shifted.

15         The CDC has known the range the Relators counsel

16   told you has changed.  The range has, but the median hasn't.

17   And so, on that point, alone, I think all of the parties agree

18   that, on this thing, on this element, there is actual

19   knowledge by the CDC, and it's the most important driver.

20         I'll also note, on actual knowledge --

21         THE COURT:  They don't agree with that, I guarantee

22   it.  So what's your next point?  Go ahead.

23         MS. ELLSWORTH:  The Relators and the United States

24   said, the U.S. didn't have actual knowledge here, but if you

25   look at Merck Exhibit 205, that is the Dr. Kessler

1    submissions.  That is 30 pages of submissions from Dr. Kessler

2    laying out their best story.  They absolutely -- the CDC and

3    the FDA, the Commissioner of the FDA and the Director of the

4    CDC and a whole bunch of other public health officials at HHS,

5    everyone who Dr. Kessler wanted to send this to, received it,

6    so that the FDA and the CDC have that knowledge to.

7              It's not a lack of knowledge here, that's the issue.

8    It's that that knowledge wasn't persuasive to the CDC in

9    changing any of its purchasing habits.

10             And the argument that because Merck defended itself

11   to the CDC, that meant the agency couldn't evaluate whether or

12   not this was valid concern really makes no sense, when you

13   think that the Relators are going to ask a lay jury to make

14   that assessment.  That is what would be the absurd outcome

15   here, and that's why the Nargle and the D'Agostino case that

16   we cited in our papers, and I didn't hear the U.S. respond to,

17   I think are really important ones for the Court to look at.

18             The False Claims Act is not about second-guessing

19   agency judgment, and that is, really, what the Relators are

20   asking you to do today.

21             And I think I'll save the rest of what I have, Your

22   Honor.

23             MR. SCHNELL:  Your Honor, may I have two minutes,

24   please?

25             THE COURT:  Sure.

1          MR. SCHNELL:  On the CDC knowledge, what I omitted

2     from, also, when I spoke, we deposed the 30(b)(6) witnesses.

3     We asked them, do you have any knowledge of any of the potency

4     issues in the complaint.  This is years after the complaint.

5     Do you have any knowledge?  They said, no.

6          They didn't even know that Merck had had to double

7     the Mumps' potency.  They had no knowledge of the clinical

8     trial fraud.  They had no knowledge of anything.  This is

9     their own witnesses.  That speaks directly to what the CDC

10    knows and doesn't know, not this conjecture about, well, they

11    must have done something; they must have gotten something.

12         And, again, with the exhibit that they're pointing

13    to, 205, I would point you to pages 47 and 48, where they

14    included the falsified information.

15         The most important point that we haven't touched is,

16    now, we finally have another Mumps vaccine.  It's the GSK

17    vaccine.  It's only been approved for a few months.  The CDC

18    has already started to shift some of its purchases away from

19    Merck to CDC.  That's one action that has changed.

20         Other actions, they said the CDC has done nothing.

21    The CDC has done a lot to investigate the resurgence.  They've

22    set up investigatory panels, a working group exclusively

23    devoted to this.  They changed their vaccine recommendations

24    in 2006 from -- first, they thought you only needed one shot.

25    They changed it to two shots.  They changed it, again, in 2017

1    to three shots for outbreaks, and there are internal documents

2    from the CDC, which we have in our papers, referencing their

3    "vital need" for a second supplier.

4         So to say that the CDC has done nothing is just not

5    true.  It's all about conjecture.  The CDC has done stuff,

6    including shifting their purchases, starting to shift their

7    purchases, so you cannot say that is beyond dispute that that

8    is any indication of how the CDC feels about the allegations

9    in this case.

10        And I'll stop there.

11        THE COURT:  All right.

12        Anything else, Counsel?

13        MS. ELLSWORTH:  I would just note that on these

14   questions about the CDC witnesses who were deposed, it was

15   Relators' burden to put a document in front of the CDC and ask

16   that witness if it would have changed anything about CDC's

17   purchasing if the witness had known that.  They didn't do

18   that, because they wouldn't have liked the answer.

19        THE COURT:  All right.  Anything else?  A last word?

20        MR. SCHNELL:  We did put those questions before

21   Merck's experts, who were CDC witnesses, and the CDC

22   witnesses, and they reaffirmed, these are prerequisites for

23   purchasing, so they absolutely did support materiality here.

24        THE COURT:  All right, Counsel, thank you.

25        ALL COUNSEL:  Thank you, Your Honor.

1        THE COURT:  All right.  Chris, we'll take ten

2    minutes.  We'll take ten minutes.

3        COURTROOM DEPUTY:  All rise.

4        (Proceedings concluded at 11:40 a.m.)

5                         * * *

6

7              **C E R T I F I C A T I O N**

8

9        I, Jacqueline Mullica, court approved transcriber,

10   certify that the foregoing is a correct transcript from the

11   official electronic sound recording of the proceedings in the

12   above-entitled matter on January 24, 2023 from 10:11 a.m. to

13   11:40 a.m.

14

15

16

17

18   ____/s/Jacqueline Mullica____    January 25, 2023

19   JACQUELINE MULLICA

20   DIANA DOMAN TRANSCRIBING, LLC

21

22

23

24

25